1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   WILLIAM ROUSER,

11              Plaintiff,              No. CIV S-06-1527 LKK GGH P
                  vs.
12

13   JAMES TILTON, et al.,

14              Defendants,              <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16   I.  <u>Introduction</u>

17              Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. §

18   1983.  Pending before the court are the parties' cross motions for summary judgment.[1]  Docs. 66,

19   83.

20   II.  <u>Background</u>

21              This case is proceeding on the original complaint (Compl.), filed on July 11,

22   2006, against the defendants who were employed at California State Prison - Sacramento (CSP-

23   Sac) or Mule Creek State Prison (MCSP).  Plaintiff alleges violations of his First Amendment

24   rights in the free exercise of religion, the Religious Land Use and Institutionalized Persons Act

25   _____

26        [1] Plaintiff's motion for summary judgment raises claims not in the complaint that the
     court will not address.  The claims in this case will be set forth below.

                                    1

(RLUIPA), his ability to access the courts and file inmate grievances and a Fourteenth Amendment equal protection claim.

This is yet another action derived from case CIV S-93-0767 LKK GGH, where plaintiff alleged his ability to practice his Wiccan religion was hampered from 1990 to 1997 at CSP-Sac.  On January 13, 2006, the court ordered that plaintiff could file a supplemental complaint regarding the continued violations of the specific rights alleged in the complaint in CIV S-93-0767 LKK GGH, that were now occurring due to his transfer to MCSP and incidents at CSP-Sac occurring after 1999.[2]  That supplemental complaint was severed and became the instant action.

Plaintiff is not an unfamiliar figure to the undersigned or the Eastern District in general.  Since the 1993 action, plaintiff has brought no less than seven actions either again claiming a violation of his First Amendment/RLUIPA rights, or that untoward actions have occurred to him as a result of his litigation notoriety, or some combination of both.   The undersigned also recently issued findings and recommendations to dismiss another of plaintiff's cases regarding his ability to practice Wicca at MCSP.  See CIV S-07-1107 JAM GGH.

Plaintiff names 26 defendants in this case.  The allegations involve a multitude of alleged violations but mostly concern plaintiff's ability to order religious items, access to a pagan chaplain and access to grounds for Wiccan rituals.  However, plaintiff does not identify what claims apply to what defendants.  Moreover, while plaintiff describes in detail the actions of a few defendants, there is hardly any information concerning a majority of the defendants and it is not entirely clear how they violated plaintiff's constitutional rights.  Ultimately, plaintiff has provided a diary-like recounting of his religious practices in both institutions and provided the names of nearly everyone involved in religious life at these facilities.  Plaintiff seems to assert

---

[2] Claims for injunctive relief regarding MCSP were to be handled in case CIV S-93-0767 LKK GGH.  Regardless, the injunctive claims regarding MCSP are now moot as plaintiff has been transferred to a different prison.

1  that all of these incidents when combined demonstrate a violation of his constitutional rights to

2  practice his religion.  However, it was plaintiff's responsibility to demonstrate a violation of his

3  constitutional rights and set forth triable issues of fact using more than mere allegations from his

4  complaint.

5         Unfortunately, plaintiff's motion for summary judgment and his opposition to

6  defendants' motion for summary judgement provide no more details concerning the defendants

7  or claims.  Plaintiff's motion for summary judgment essentially repeats the facts from his

8  complaint and then attaches approximately 270 pages of exhibits.  While plaintiff does provide

9  an itemized list of the exhibits, plaintiff does not reference any of the exhibits in his motion or

10  discuss their meaning.  It is not the court's responsibility to sift through all of plaintiff's exhibits

11  and find support for his allegations.  The court is not in a position to understand the relevance of

12  all the exhibits or speculate as to their meaning and importance.

13         For the reasons that follow, plaintiff's motion for summary judgment should be

14  denied, defendants' motion for summary judgment should be granted and this case should be

15  closed.

16  III.  Motion for Summary Judgment

17         Legal Standard for Summary Judgment (Cross Motions)

18         Burdens on summary judgment motion differ depending on who will carry the

19  burden of persuasion at trial.  "As the party with the burden of persuasion at trial, the [moving

20  party] must establish "beyond controversy every essential element of its' [ ] claim.  [The non-

21  moving party] can defeat summary judgment by demonstrating the evidence, taken as a whole,

22  could lead a rational trier of fact to find in its favor."  Southern California Gas Co. v. City of

23  Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003).

24         Summary judgment is appropriate when it is demonstrated that there exists "no

25  genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

26  law."  Fed. R. Civ. P. 56(c).

1

       Under summary judgment practice, the moving party

2

       always bears the initial responsibility of informing the district court
of the basis for its motion, and identifying those portions of "the

3

       pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any," which it believes

4

       demonstrate the absence of a genuine issue of material fact.

5 Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ.

6 P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

7 issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

8 depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment

9 should be entered, after adequate time for discovery and upon motion, against a party who fails to

10 make a showing sufficient to establish the existence of an element essential to that party's case,

11 and on which that party will bear the burden of proof at trial. See id. at 322, 106 S. Ct. at 2552.

12 "[A] complete failure of proof concerning an essential element of the nonmoving party's case

13 necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment

14 should be granted, "so long as whatever is before the district court demonstrates that the standard

15 for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323, 106 S. Ct. at

16 2553.

17        If the moving party meets its initial responsibility, the burden then shifts to the

18 opposing party to establish that a genuine issue as to any material fact actually does exist. See

19 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

20 (1986). In attempting to establish the existence of this factual dispute, the opposing party may

21 not rely upon the allegations or denials of its pleadings but is required to tender evidence of

22 specific facts in the form of affidavits, and/or admissible discovery material, in support of its

23 contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

24 106 S. Ct. at 1356 n. 11. The opposing party must demonstrate that the fact in contention is

25 material, i.e., a fact that might affect the outcome of the suit under the governing law, see

26 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

1  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

2  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

3  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

4         In the endeavor to establish the existence of a factual dispute, the opposing party

5  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

6  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

7  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

8  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

9  genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

10  56(e) advisory committee's note on 1963 amendments).

11         In resolving the summary judgment motion, the court examines the pleadings,

12  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

13  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

14  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

15  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct.

16  at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

17  obligation to produce a factual predicate from which the inference may be drawn.  See Richards

18  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

19  (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

20  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

21  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

22  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

23     Undisputed Facts

24         The following of defendants' undisputed facts (DUF) are either not disputed by

25  plaintiff, or following the court's review of the evidence submitted, have been deemed

26  \\\\\

undisputed:[3]

Plaintiff was incarcerated in CSP-Sac from April 1999 until being transferred to MCSP in March 2005.  DUF #1.  Plaintiff was incarcerated at MCSP from March 2005 until his transfer in June 2007.  DUF #2.  Plaintiff practices the Khemetic system of Wicca and since 1985 has been a third degree High Priest capable of conducting religious services on his own.  DUF #3,4.

CSP-Sac Defendants

Pliler was a former warden at CSP-Sac.  DUF #10.  Plaintiff alleges that Pliler was aware of problems plaintiff had in placing and receiving orders for religious artifacts.  DUF #11.

Rosario was a former chief deputy warden at CSP-Sac, and plaintiff alleges that Rosario was also aware of problems plaintiff had in placing and receiving orders for religious artifacts.  DUF #13, 14.

Jackson was the former community resource manager who was responsible for enforcing the policies affecting religious programs.  DUF #15.  Jackson promised that plaintiff would be permitted to order religious items and be provided the opportunity to practice his religion.  DUF #18.

The only allegations against Carlson and Grant are that they failed to process some paperwork that caused plaintiff to miss a Sabbat.  DUF #24, 54.

Till was a correctional officer.  DUF #32.  Plaintiff alleges that Till verbally harassed him and would not allow a person in the prison waiting room to act as best man in plaintiff's wedding.  Id.

\\\\\

---

[3] As stated above, plaintiff's motion for summary judgment was less than helpful in determining the undisputed facts.  Plaintiff essentially repeats the facts from his complaint and then attaches approximately 270 pages of exhibits.  While plaintiff does provide an itemized list of the exhibits, plaintiff does not reference any of the exhibits in his motion.

1          Hannigan was a correctional officer who did not normally work in plaintiff's area

2   of CSP-Sac.  DUF #35.  In 2001 Hannigan was in plaintiff's area escorting a group of Enhanced

3   Outpatient Program (EOP) inmates to the chapel.  DUF #36.  Hannigan was also providing

4   security for the EOP inmates.  Id.  Plaintiff wanted Hannigan to allow him access to the chapel

5   and to the locked cabinet in the chapel.  DUF #39, 43.  Hannigan did not think plaintiff was

6   allowed unsupervised access to the chapel and did not allow him in.  DUF 38, 39.  When

7   Hannigan was instructed by another official to let plaintiff in the chapel, Hannigan complied.

8   DUF #42.  Hannigan did not unlock the cabinet because he did not have the key.  DUF #43.

9          The only allegations against Swope, who is a correctional officer, is that he

10  searched the Wiccan altar (a sealed box) that was in another inmates possession and to do so, cut

11  the bottom of the box.  DUF #44.

12         Stewart is a chaplain, and plaintiff alleges another inmate heard Stewart say that

13  Wiccans were not welcome in the chapel.  DUF #45.

14         Hill, Wiley, Goldsmith and Johnson were supervisors of the mailroom.  DUF #48,

15  49, 50, 53.  Plaintiff alleges that as supervisors they were responsible for the mail.  Id.  Plaintiff

16  also alleges that Johnson denied an inmate grievance that plaintiff filed.  DUF #52.

17         Plaintiff alleges that Hamad, as supervisor of academic instruction failed to play

18  Wiccan religious videos on the institutional channel, but played other religious videos.  DUF

19  #56.  Hamad can only play videos that are provided by the prison chaplain or the community

20  resource manager, not any videos given to her by an inmate.  Hamad Declaration at 2.  Plaintiff

21  did not actually have the video but wanted to buy it and have it mailed directly to Hamad.  Id.

22  Hamad was thus unable to view the video to determine if it was appropriate.  Id.  Later, Hamad's

23  supervisors stopped broadcasting all religious videos.  Id. at 2-3.

24         MCSP Defendants

25         Bunnell was the associate warden of housing at MCSP and was responsible for

26  supervising and monitoring compliance with policies involving religion.  DUF #60.

1    Page was the associate warden of central services and was responsible for rules,

2    regulations and policies effecting religion.  DUF #65.

3    Plaintiff alleges that Stacy, a correctional officer returned one of plaintiff's

4    packages to the sender because it did not contain the proper labels indicating that the sender is a

5    business or a description of the items in the package.  DUF #66, 67, 68.  Packages that do not

6    meet these criteria are returned to the sender.  DUF #67.

7    Pogue was a correctional officer.  DUF #69.  There was a grassy area between two

8    buildings that was considered restricted for use by inmates unless they received permission from

9    correctional staff.  DUF# 70.  Pogue did not allow plaintiff to use this area.  DUF #69.

10   Unbeknownst to Pogue, non-defendant Captain Steele allowed plaintiff and other Wiccan

11   inmates to use this area.  DUF #71.

12   The only allegations against Castro are that he refused, at plaintiff's urging, to call

13   a supervisor to have a chaplain return from another facility during a Sabbat and that Castro

14   refused to send one of plaintiff's envelopes that plaintiff admits was an improper envelope.  DUF

15   #72; Compl. at 22.

16   Plaintiff contends that Reyes did not process his administrative grievance as an

17   emergency grievance and as a result plaintiff missed a Sabbat.  DUF #73.

18   Plaintiff accuses Espinoza of not responding to an inmate grievance.  DUF #75.

19   Plaintiff states that Kanipe, the former litigation coordinator lied in a memo,

20   saying plaintiff had everything he needed for religious services, even though red and blue candles

21   were not allowed until a later date.  DUF #87.

22   Barham was the Protestant chaplain at MCSP.  DUF #77.  Plaintiff concedes that

23   Barham approved of eight ritual observances for Wiccan Holy Days.  DUF #84.

24   Schwarzenegger is Governor of California and Tilton and Hickman were

25   Secretaries of California Department of Corrections and Rehabilitation (CDCR).  DUF #89, 91,

26   92.  Plaintiff alleges these defendants are liable in a supervisorial capacity.  Id.

1   Disputed Facts

2        The parties do not generally dispute the above facts, rather plaintiff feels that the

3   above actions violated his constitutional rights.

4   Analysis

5        1.  Preliminary Matters

6   Injunctive Relief

7        Plaintiff seeks injunctive relief regarding his claims at CSP-Sac and MCSP.

8   However, it is undisputed that plaintiff is no longer incarcerated at either of those facilities.

9   Therefore, plaintiff's claims for injunctive relief are moot as he has not provided any evidence

10  that he may be transferred back to either facility.  See Johnson v. Moore,  948 F.2d 517, 519 (9th

11  Cir. 1991) (per curiam) (transfer to another prison by prisoner challenging conditions of

12  confinement renders moot any request for injunctive relief absent evidence of reasonable

13  expectation that prisoner will be transferred back).  Thus, the claims hereafter may only be

14  reviewed against all defendants in their individual capacities.

15            Supervisory Liability (Individual Capacity)

16       Plaintiff alleges that the following defendants are liable due to their supervisorial

17  positions: Hill, Wiley, Goldsmith, Tilton, Hickman, Espinoza, Reyes, Rosario, Pliler,

18  Schwarzenegger and Johnson.

19       Supervisory personnel are generally not liable under § 1983 for the actions of their

20  employees under a theory of respondeat superior and, therefore, when a named defendant holds a

21  supervisorial position, the causal link between him and the claimed constitutional violation must

22  be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v.

23  Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations concerning the

24  involvement of official personnel in civil rights violations are not sufficient.  See Ivey v. Board

25  of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

26  \\\\\

9

1    Plaintiff has set forth no facts linking these defendants to the alleged

2 constitutional violations.  Plaintiff simply concludes that these defendants were aware of what

3 was transpiring and therefore are liable.  As plaintiff's conclusory allegations are insufficient

4 these defendants should be dismissed.

5    2. Access the Courts

6    Plaintiff contends that defendants violated his right to access the courts by

7 destroying inmate grievances and harassing him for using the court system.

8    Prisoners have a constitutional right to be afforded  "a reasonably adequate

9 opportunity to present claimed violations of fundamental constitutional rights to the courts."

10 Lewis v. Casey, 518 U.S. 343, 351, 116 S.Ct. 2174 (1996).  This right applies to prisoners'

11 challenges to their convictions or sentences or conditions of confinement.  Id. at 354.  Prison

12 officials may not "actively interfer[e] with inmates' attempts to prepare legal documents or file

13 them."  Id. at 350.  To establish a claim for any violation of the right of access to the courts,

14 prisoners must prove an actual injury by showing that their efforts to pursue a non-frivolous

15 claim concerning their conviction or conditions of confinement has been hindered.  Id. at 350-55.

16    In the instant case, plaintiff has presented no evidence that he was hindered trying

17 to purse a claim in another non-frivolous case.  Plaintiff simply makes general statements that his

18 ability to pursue other litigation was hampered without citing any specific facts.  Plaintiff merely

19 states he was trying to send an envelope to Judge Karlton regarding CIV S-93-0767 LKK GGH.

20 Plaintiff has failed to meet his burden to show a constitutional violation.

21    With regard to plaintiff's claims concerning his inmate appeals, plaintiff is

22 informed that prisoners do not have a "separate constitutional entitlement to a specific prison

23 grievance procedure."  Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003), citing Mann  v.

24 Adams, 855 F.2d 639, 640 (9th Cir. 1988).  Even the nonexistence of, or the failure of prison

25 officials to properly implement, an administrative appeals process within the prison system does

26 not raise constitutional concerns.  Mann v. Adams, 855 F.2d at 640.  See also, Buckley v.

1  <u>Barlow</u>, 997 F.2d 494, 495 (8th Cir. 1993); <u>Flick v. Alba</u>, 932 F.2d 728 (8th Cir. 1991); <u>Azeez v.</u>

2  <u>DeRobertis</u>, 568 F.Supp. 8, 10 (N.D.Ill. 1982) ("[A prison] grievance procedure is a procedural

3  right only, it does not confer any substantive right upon the inmates.  Hence, it does not give rise

4  to a protected liberty interest requiring the procedural protections envisioned by the fourteenth

5  amendment").  Specifically, a failure to process a grievance does not state a constitutional

6  violation.  <u>Buckley</u>, <u>supra</u>.  State regulations give rise to a liberty interest protected by the Due

7  Process Clause of the federal constitution only if those regulations pertain to "freedom from

8  restraint" that "imposes atypical and significant hardship on the inmate in relation to the ordinary

9  incidents of prison life."  <u>Sandin v. Conner</u>, 515 U.S. 472, 484, 115 S.Ct. 2293, 2300, 132

10  L.Ed.2d 418 (1995).[4]

11     Thus, summary judgment should be granted on these claims as plaintiff has failed

12  to meet his burden in showing any actionable violations.

13     3.  <u>RLUIPA</u>

14     The Religious Land Use and Institutionalized Persons Act of 2000 provides in

15  part:

16     No government shall impose a substantial burden on the religious exercise of a
   person residing in or confined to an institution . . . even if the burden results from

17     a rule of general applicability, unless the government demonstrates that imposition
   of the burden on that person-

18

19     (1) is in furtherance of a compelling government interest; and
   (2) is the least restrictive means of furthering that compelling government interest.

20  42 U.S.C. § 2000cc-1.

21  _____

22    [4] "[W]e recognize that States may under certain circumstances create liberty interests
which are protected by the Due Process Clause.  <u>See also</u> <u>Board of Pardons v. Allen</u>, 482 U.S.

23  369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987).  But these interests will be generally limited to
freedom from restraint which, while not exceeding the sentence in such an unexpected manner as

24  to give rise to protection by the Due Process Clause of its own force, <u>see</u>, <u>e.g.</u>, <u>Vitek v. Jones</u>,
445 U.S. 480, 493, 100 S.Ct. 1254, 1263-1264, 63 L.Ed.2d 552 (transfer to mental hospital), and

25  <u>Washington v. Harper</u>, 494 U.S. 210, 221-222, 110 S.Ct. 1028, 1036-1037, 108 L.Ed.2d 178
(involuntary administration of psychotropic drugs), nonetheless imposes atypical and significant

26  hardship on the inmate in relation to the ordinary incidents of prison life."  <u>Sandin v. Conner</u>,
<u>supra</u>.

1    As discussed above, plaintiff's claims for injunctive relief are moot, therefore the

2    sole issue for his claims under RLUIPA concern monetary damages from defendants in their

3    individual and official capacities.  However, monetary damages are not recoverable under

4    RLUIPA.

5        Individual Capacity

6    RLUIPA creates a cause of action for suits against "a government," which is

7    defined, in pertinent part, as a "State, county, municipality, or other governmental entity," and

8    "branch, department, agency, instrumentality, *or official* of an entity listed in [the previous

9    clause]," and "*any other person* acting under color of state law."  42 U.S.C. § 2000cc-5(4)

10   (emphasis added).  Despite this language, several Circuit Courts have held that RLUIPA does not

11   create a cause of action for damages against officials in their individual capacity.  See Rendelman

12   v. Rouse, 569 F.3d 182, 187-89 (4th Cir. 2009); Nelson v. Miller, 570 F.3d 868, 886-89 (7th Cir.

13   2009); Sossamon v. Lone Star State of Texas, 560 F.3d 316, 327-29 (5th Cir. 2009); Smith v.

14   Allen, 502 F.3d 1255, 1271-75 (11th Cir. 2007).  These Circuits concluded that Congress enacted

15   RLUIPA pursuant to the Spending Clause and did not indicate with sufficient clarity an intent to

16   condition the states' receipt of federal funds on the creation of an individual capacity action for

17   damages; moreover, a contrary reading of the statute would raise serious constitutional concerns

18   about the extent of Congress's authority under the Spending Clause.  See Rendelman, 569 F.3d at

19   187-89; Nelson, 570 F.3d at 887-89; Sossamon, 560 F.3d at 327-29; Smith, 502 F.3d at 1271-75.

20   The Ninth Circuit has not yet addressed this issue.[5]  However, the Ninth Circuit

21   has upheld the constitutionality of RLUIPA as an enactment under the Spending Clause.  See

22   Mayweathers v. Newland, 314 F.3d 1062, 1066-67 (9th Cir. 2002).  Thus, this court adopts the

23

24   _____
        [5] However, although not addressing the issue, the Ninth Circuit has issued unpublished
25   decisions that, by affirming defendants' entitlement to qualified immunity, implicitly assume the
     existence of an individual capacity RLUIPA claim for damages. See Campbell v. Alameida, 295
26   Fed. Appx. 130, 131 (9th Cir. 2008); Von Staich v. Hamlet, 2007 WL 3001726, at *2 (9th Cir.
     2007).

reasoning of the Fourth, Fifth, Seventh, and Eleventh Circuits in the above cases and concludes that plaintiff cannot assert a RLUIPA claim for damages against defendants in their individual capacities. See Rupe v. Cate, 688 F.Supp.2d 1035, 1046 (E.D. Cal. 2010); Harris v. Schriro, 652 F.Supp.2d 1024, 1028-30 (D. Ariz., Aug.11, 2009) (dismissing individual capacity claims for damages under RLUIPA based on out-of-circuit authority); Pogue v. Woodford, 2009 WL 2777768, *9 (E.D. Cal., August 26, 2009); but see Guru Nanak Sikh Society of Yuba City v. County of Sutter, 326 F. Supp.2d 1140, 1162 (E.D. Cal. 2003)[6] (court noted that the recovery of damages under RLUIPA is an open question and only granted plaintiff nominal damages of one dollar against each defendant); Sokolsky v. Voss, 2009 WL 2230871, *5-6 (E.D. Cal., July 24, 2009) (court found on a motion to dismiss that defendants in their individual capacities were not entitled to qualified immunity regarding a Kosher food claim). Therefore, plaintiff's RLUIPA claims for damages against defendants in their individual capacities should be dismissed.

### Official Capacity

The next issue is whether plaintiff can assert a RLUIPA claim for damages against defendants in their official capacities. "[A] suit against a state official in his or her official capacity is . . . no different from a suit against the State itself." Will v. Michigan Dep't. of State Police, 491 U.S. 58, 71 (1989). The Eleventh Amendment prohibits federal jurisdiction over claims against a state unless the state has consented to suit or Congress has abrogated its immunity. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 99-100 (1984). The state's consent to suit, however, must be unequivocally expressed. Id.

While there is a split of authority between the other circuits regarding whether a state's receipt of prison funds constitutes a waiver of its sovereign immunity from suits seeking

---

[6] Guru Nanak Sikh Society of Yuba City was decided by the Honorable Lawrence K. Karlton, who is the District Judge assigned to the instant case. While the undersigned would normally defer to that decision, that case was decided in 2003 and based on the extensive out of circuit authority that has been decided in the last few years at the appellate level and the in-district cases relying on that authority, the undersigned believes the issue is again worthy of analysis.

monetary damages, the Ninth Circuit recently issued an opinion concerning this issue.  On April

5, 2010, the Ninth Circuit held in <u>Holley v. California Dept. Of Corrections</u>, 599 F.3d 1108, 1114

(9th Cir. 2010), that the "Eleventh Amendment bars [] suit for official-capacity damages under

RLUIPA."  <u>Id</u>.  The Ninth Circuit noted the following while referring to the "appropriate relief"[7]

language in the RLUIPA statute:

> This statutory text does not "unequivocally express[ ]" a waiver of sovereign immunity.  The phrase "appropriate relief" does not address sovereign immunity specifically at all, let alone "extend [a waiver of sovereign immunity] unambiguously to . . . monetary claims" in particular.  We join five of the six circuits to have considered this question in holding that "RLUIPA's 'appropriate relief' language does not unambiguously encompass monetary damages so as to effect a waiver of sovereign immunity from suit for monetary claims . . ."

<u>Id</u>. at 1112 (internal citations omitted).

Therefore, plaintiff's claims against defendants in their official capacities are

barred by the Eleventh Amendment.

4.  <u>Free Exercise/ Equal Protection</u>

The only issues remaining are if plaintiff is entitled to monetary damages for

alleged violations of his free exercise rights and the equal protection clause.  The court is not

entirely certain how to review these claims.  As stated above, plaintiff has named 26 defendants

and not identified which claims are connected to which defendants.  In addition, there are very

few allegations against the majority of these defendants and plaintiff has provided very little

support for the allegations other than 270 pages of exhibits that are not referenced in his motions.

Legal Standard

While inmates retain their First Amendment right to the free exercise of religion, a

regulation impinging on an inmate's constitutional rights passes muster so long as it is

reasonably related to a legitimate penological interest.  <u>Henderson v. Terhune</u>, 379 F.3d 709, 712

---

[7] A person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain *appropriate relief* against a government.  42 U.S.C. § 2000cc-2(a) (emphasis added).

1    (9th Cir. 2004), citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400 (1987)

2    and Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254 (1987).  The Turner test includes four

3    factors to determine if a prison regulation violates a prisoner's constitutional rights.  "First, there

4    must be a valid, rational connection between the prison regulation and the legitimate

5    governmental interest put forward to justify it, and the governmental objective itself must be a

6    legitimate and neutral one.  A second consideration is whether alternative means of exercising

7    the right on which the regulation impinges remains open to prison inmates.  A third consideration

8    is the impact accommodation of the asserted right will have on guards, other inmates, and the

9    allocation of prison resources.  Finally, the absence of ready alternatives is evidence of the

10   reasonableness of a prison regulation."  Allen v. Toombs, 827 F.2d 563, 567 (9th Cir. 1987)

11   (citing Turner, 482 U.S. at 89-91; see also, Malik v. Brown III, 71 F.3d 724, 728-729 (9th

12   Cir.1995).

13          The "Equal Protection Clause of the Fourteenth Amendment commands that no

14   State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

15   essentially a direction that all persons similarly situated should be treated alike."  City of

16   Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249 (1985).

17          "The Equal Protection Clause entitles each prisoner to 'a reasonable opportunity

18   of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to

19   conventional religious precepts.'"  Shakur v. Schriro, 514 F.3d 878, 891 (9th Cir. 2008) (quoting

20   Cruz v. Beto, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)).  The Turner test

21   described above applies also to Equal Protection claims arising out of prison.  Shakur, 514 F.3d

22   at 891.

23          Furthermore, the Civil Rights Act under which many of the claims were filed

24   provides as follows:

25          Every person who, under color of [state law] . . . subjects, or causes
             to be subjected, any citizen of the United States . . . to the
26          deprivation of any rights, privileges, or immunities secured by the

15

Constitution . . . shall be liable to the party injured in an action at
law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

(1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or

omits to perform an act which he is legally required to do that causes the deprivation of which

complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Discussion

While plaintiff listed many defendants in the complaint, there are only the barest

allegations against many of them.

Plaintiff alleges that Carlson forgot to process paperwork, and then made an

excuse.  Compl. at 17, Plaintiff's MSJ at 2.

Plaintiff alleges that Stacey returned some items that had been mailed to plaintiff,

because Stacey believed they were not from an approved vendor.

Plaintiff states that Pogue disrupted some services and filed a report that several

Wiccan members burned a cross that upset other inmates, when in fact, no other inmates were

upset.  Plaintiff's MSJ at 6.  Plaintiff also states that Pogue would not let Wiccans onto an area

unless they had the proper form with them that allowed them to be there.  Plaintiff does not

indicate how many times this occurred.

It is alleged that Till repeatedly called plaintiff names and prevented someone

from participating in plaintiff's wedding.  Compl. at 16.

The only allegations against Stewart are that another inmate told plaintiff that

Stewart stated that Wiccans were not welcome in the Chapel.  Compl. at 15.

\\\\\

16

1    Plaintiff contends that Hannigan would not let plaintiff into the chapel and would

2    not unlock a cabinet.  It is undisputed that this was the only interaction between plaintiff and

3    Hannigan.  When Hannigan was instructed by another official to let plaintiff in the chapel,

4    Hannigan complied.  Hannigan insisted that he did not have a key to the cabinet, but plaintiff

5    maintains that other prison officials in Hannigan's position had keys to the cabinet.

6    There are very few allegations against Page, who is an associate warden.  In the

7    complaint, plaintiff states that he requested to be able to perform religious services as the other

8    religions are allowed, but Page denied the request.  Plaintiff's further pleadings do not aid in

9    shedding any light on plaintiff's request or what Page denied.

10    It is alleged that Grant failed to process some paperwork.

11    The only allegation against Swope is that he searched the Wiccan alter (a sealed

12    box) that was in another inmates possession and to do so, cut the bottom of the box.

13    The only allegations against Castro are that he refused, at plaintiff's urging, to call

14    a supervisor to have a chaplain return from another facility during a Sabbat and that Castro

15    refused to send one of plaintiff's envelopes that plaintiff admits was an improper envelope.

16    Plaintiff states that Kanipe, the former litigation coordinator lied in a memo,

17    saying plaintiff had everything he needed for religious services, even though red and blue candles

18    were not allowed until a later date.

19    Jackson, the community resource manager, was responsible for enforcing the

20    policies effecting religious programs.  Jackson promised that plaintiff would be permitted to

21    order religious items and be provided the opportunity to practice his religion, but plaintiff asserts

22    that problems persisted.  However, these problems were not attributed to Jackson.  Plaintiff also

23    alleges that Jackson was responsible for preventing a volunteer chaplain from conducting

24    services.  Other than this conclusory statement, plaintiff provides no other details how Jackson

25    interfered with the volunteer chaplain.

26    \\\\\

1    Barham was the Protestant chaplain at MCSP.  Plaintiff concedes that Barham

2    approved of eight ritual observances for Wiccan Holy Days.  Plaintiff also discusses how Barham

3    aided helping the mail problems so that plaintiff could more easily order religious items.  Compl.

4    at 20.  Plaintiff does allege that Barham once stated that he was too busy to deal with plaintiff's

5    problems.  Plaintiff next alleges that on October 31, 2005, Barham informed him that all Pagan

6    religious orders would be suspended until the operations manual was updated.  Plaintiff alleges

7    that as a result he could not acquire certain religious items and for 18 weeks he was only able to

8    have two Thursday services.  In plaintiff's motion for summary judgment he states that it was

9    almost a year before he was able to order religious items again, though plaintiff's own exhibits

10   indicate he was able to place an order on July 31, 2006.  Plaintiff's MSJ at 19.  Plaintiff's list of

11   exhibits refers to an exhibit describing Barham's order, yet the exhibit is not attached.  Plaintiff's

12   MSJ at 20, Exh. zzz.  Assuming plaintiff's allegations are true, it is still not clear how the ability

13   to practice his religion was burdened.  Plaintiff was able to conduct ritual observances on the

14   following Holy Days during the alleged year long suspension: 12/23/05-Yul, 2/2/06-Ibolg,

15   3/21/06-Eostre, 5/1/05-Beltaine.  Compl., Part 4, at 30.

16   Bunnell was the associate warden of housing at MCSP and was responsible for

17   supervising and monitoring compliance with policies involving religion.  Plaintiff alleges that he

18   met with Bunnell and a program was outlined to correct prior problems and allow plaintiff to

19   acquire necessary religious items.  Compl. at 20.  Plaintiff later states that Bunnell grew tired of

20   plaintiff's correspondence and instructed plaintiff to deal with Barham.  Id.  Plaintiff also states

21   that the procedures that Bunnell provided were not fully complied with by other defendants.[8]

22   Hamad was supervisor of academic instruction and plaintiff alleges that Hamad

23   failed to play Wiccan religious videos on the institutional channel, but played other religious

24   _____

25   [8] For example, Bunnell set up procedures to allow religious items to be ordered by
     plaintiff, yet other defendants sent back the religious items because the mail was not properly
     inventoried pursuant to CDCR regulations.  This conduct does not rise to the level of a
26   constitutional violation nor does it implicate Bunnell.

1  videos.  While this could be construed as a viable equal protection claim, it is undisputed that

2  Hamad refused to play plaintiff's video, because prison restrictions prevented her from playing

3  videos unless they were supplied by the prison chaplain or the community resource manager.

4  These are reasonable restrictions to prevent every inmate from submitting a video to be played.

5  In addition, plaintiff did not have possession of the video so Hamad was unable to view it to

6  make a determination if it was appropriate.  Regardless, all religious videos were eventually

7  ceased from being broadcast, so all religions were thus treated the same.

8          Despite the uncertainty of which claims are directed against which defendants,

9  plaintiff's free exercise and equal protection claims fail.  Plaintiff has failed to link the majority

10  of these defendants to any constitutional deprivation.  Looking at plaintiff's pleadings as a whole

11  and reviewing all of his allegations, plaintiff argues that prison officials have issued memoranda

12  and created procedures to accommodate plaintiff's needs, but the entire prison apparatus has not

13  met his expectations in carrying out the procedures.

14          A review of plaintiff's complaint shows that a primary concern to plaintiff is his

15  ability to order religious items.  It is undisputed that defendants created a plan to allow plaintiff

16  to order these goods.  It is undisputed that some goods arrived, while others were held for a time

17  until determined not be a security threat and provided to plaintiff.  Compl. at 11.  Plaintiff states

18  that for 2-3 months a procedure was set in place that worked well but then that procedure was

19  changed and there are issues with the mailroom and the receiving and releasing department.

20  Plaintiff has failed to set forth sufficient allegations concerning how the issues with delivery of

21  items burdened his religious practices.  While it is clear that certain religious ceremonies could

22  not be completed on time due to problems with the mailroom, defendants went to great length to

23  accommodate plaintiff.  Plaintiff has failed to show that his ability to receive religious items by

24  the mail was anything more than a sporadic and short term inconvenience which is not a

25  constitutional violation.  See Canell v. Lightner, 143 F.3d 1210, 1215 (9th Cir. 1998).

26  \\\\\

1   With respect to plaintiff's claims regarding a pagan chaplain and use of certain

2   grounds for pagan rituals, it is undisputed that a chaplain and the grounds had been provided for

3   Wiccans.  Plaintiff merely cites to instances when the grounds were restricted or a chaplain was

4   not provided.  Plaintiff has failed to set forth any facts that these were more than isolated

5   instances or that they burdened his ability to practice his religion or that any other religious group

6   had full access to everything they requested.

7   It is important to note that although prisoners are entitled to equal protection,

8   defendants are not responsible for duplicating every religious benefit provided to other religions

9   so that all religions are treated exactly the same.  As the Supreme Court stated in Cruz v. Beto,

10   405 U.S. 319, 322, n.2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972):

> We do not suggest . . . that every religious sect or group within a prison-however few in number-must have identical facilities or personnel.  A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand.  But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty.

15   Application of the standard set forth in Cruz does not require "strict numerical

16   analysis" or "create a system of ratios or quotas."  Thompson v. Commonwealth of Ky., 712 F.2d

17   1078, 1081 (6th Cir. 1983) (upholding grant of summary judgment on Muslim inmates' request

18   for access to chapel comparable to Christian inmates).

19   Under the Cruz standard, described above, defendants must provide plaintiff a

20   "reasonable opportunity" to practice his religion in a manner "comparable" to the other inmates.

21   The facts before the undersigned show that plaintiff was given a wide latitude in the practice of

22   his religion and prison officials went to great lengths to accommodate plaintiff.

23   For all these reasons, defendants' motion for summary judgment should be

24   granted and plaintiff's First and Fourteenth Amendment claims should be dismissed.

25   Qualified Immunity

26   Because the court has found that the conduct alleged by plaintiff does not state a

1  constitutional deprivation, the court need not address defendants' argument for qualified

2  immunity.

3                    Plaintiff's Motion for Summary Judgment

4                    As the court is granting defendants' motion for summary judgment and for the

5  reasons discussed above, plaintiff's motion for summary judgment is denied.

6                    Accordingly, IT IS HEREBY RECOMMENDED that:

7                    1.  Plaintiff's April 30, 2009, motion for summary judgment (Doc. 66) be denied;

8                    2.  Defendants' December 11, 2009, motion for summary judgment (Doc. 83), be

9  granted and this case closed.

10                   These findings and recommendations are submitted to the United States District

11 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

12 days after being served with these findings and recommendations, any party may file written

13 objections with the court and serve a copy on all parties.  Such a document should be captioned

14 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15 shall be served and filed within seven days after service of the objections.  The parties are

16 advised that failure to file objections within the specified time may waive the right to appeal the

17 District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

18 DATED:       07/22/2010

19                                                    /s/ Gregory G. Hollows

20                                                    _____
                                                     UNITED STATES MAGISTRATE JUDGE
   GGH: AB
21 rous1527.sj

22

23

24

25

26

21